```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
                      CHARLESTON DIVISION


      *******************************
      IN RE:  AQUEOUS FILM-FORMING   *  MDL No. 2:18-mn-2873
      FOAMS PRODUCTS LIABILITY       *
      LITIGATION                     *  May 24, 2021
      *******************************

         TRANSCRIPT OF FAIRNESS HEARING IN CAMPBELL VS. TYCO

            BEFORE THE HONORABLE RICHARD M. GERGEL
             UNITED STATES DISTRICT JUDGE, presiding


      A P P E A R A N C E S :

      For the Plaintiffs:      Napoli Shkolnik PLLC
                               BY:  PAUL J. NAPOLI, ESQ.
                               1301 Avenue of the Americas
                               10th Floor
                               New York, NY 10019

                               Goldstein and Russell PC
                               BY:  DANIEL H. WOOFTER, ESQ.
                               7475 Wisconsin Ave., Suite 850
                               Bethesda, MD 20814


      For the Defendants:      Williams & Connolly LLP DC
                               BY:  JOSEPH G. PETROSINELLI, ESQ.
                               725 12th Street NW
                               Washington, DC 20005


      Also Appearing:          PATRICK LANCIOTTI, ESQ.
                               ROBERT BILOTT, ESQ.
                               MARA MURPHY, ESQ.


      Court Reporter:          KAREN E. MARTIN, RMR, CRR
                               PO Box 835
                               Charleston, SC 29402

        Proceedings reported by stenographic court reporter.
       Transcript produced with computer-aided transcription
                             software.
```

1        Monday, May 24, 2021

2        (WHEREUPON, court was called to order at 9:56 a.m.)

3            THE COURT:  Okay, folks, good morning, everyone.

4    This is United States District Judge Richard Gergel for

5    those of you joining us remotely.  This is the fairness

6    hearing in Campbell vs. Tyco, 2:19-422.  And I'm going to

7    ask counsel who will be speaking here today to identify

8    themselves for the record, first from plaintiff's counsel.

9            MR. NAPOLI:  Sure.  Good morning, Your Honor.

10   Paul Napoli on behalf of the class.

11           THE COURT:  Very good.

12           And for the defense?

13           MR. PETROSINELLI:  Good morning, Your Honor.

14   Joe Petrosinelli for Tyco and Chemguard.

15           THE COURT:  Okay.  Now --

16           MR. NAPOLI:  Excuse me, Your Honor.  Besides

17   myself, Mr. Woofter will also be speaking.

18           THE COURT:  Good.  Good.  Let me say we're all

19   navigating here in this strange pandemic world, mask, no

20   mask.  And here is sort of my take on all of this.

21   Certainly, when you speaking, you can take off your mask

22   because I won't be able to hear you.  And it is entirely

23   your own comfort about whether you wish to have it on or

24   off while you're sitting here.  I'll let you make your own

25   decision yourself.  I respect everybody's right to do

1    that.  And, of course, we're socially distanced here.  And

2    Mr. Napoli has a plastic piece between he and his

3    co-counsel there.  I'm not sure which one is designed to

4    protect from the other, but that's okay.

5            And let me explain because I know a number of

6    people are joining us who may not be familiar with this

7    process.  A fairness hearing is to afford people who may

8    be impacted by a proposed class action to be heard and to

9    have their objections considered and weighed by the Court.

10           Excuse me, I'm going to ask folks who are on the

11   line to mute themselves please because it's going to

12   disrupt our proceeding.

13           So the purpose here is to afford everyone the

14   opportunity to be heard.  It's an important right of

15   anyone impacted by class action.  And the Court is not on

16   the side of anybody but on the side of justice.  So as

17   they say down here, I don't have a dog in this fight.

18   Okay?  All I'm trying to do is promote a fair, just, and

19   reasonable resolution of a case.

20           I thought it would be helpful at the beginning

21   just to allow, first, Mr. Napoli and then Mr. Petrosinelli

22   to summarize the settlement, to give us sort of a factual

23   overview of this.  And then as we go through and I hear

24   from specific objectors -- I have, I don't know, five or

25   so folks who have indicated they wish to speak and I want

1   to give them a chance to do that.  If something comes up

2   that I think it would be helpful to hear from counsel, I

3   may ask.  And I will say to counsel that to the extent

4   that there's something said that you feel like you want to

5   address, you ought to let me know that as well.

6         What I want to promote is a full and fair

7   exchange of ideas here and information so that at the end

8   of this we all have a better understanding of the

9   proposal.  And whether we agree or disagree may be another

10   issue, but at least I think we want everyone to be well

11   informed.

12         It's a complicated settlement.  Let's just --

13   you know, it's a -- it takes one in which I think perhaps

14   all of us today participating in this may learn something

15   as we go along here about the how the -- the actual

16   operation of this proposal.

17         Okay.  With that, Mr. Napoli, the Court welcomes

18   your summary.

19         **MR. NAPOLI:**  Sure.  Again, good morning, Your

20   Honor.  Where would you like me to be?  At the podium?

21         **THE COURT:**  Where you want to be.  I'll tell you

22   what.  I think you ought to stay at the table just to keep

23   separated from -- and you can stay -- I know when I often

24   would speak when I was a counsel, I always liked to have

25   something, you know, right in front of me.  And it

1    promotes a more -- less discipline when you're standing

2    away from your notes.  So feel free to stay seated as you

3    speak.

4            **MR. NAPOLI:**  Sure, Your Honor.  I just would

5    like to begin by just acknowledging who is on video and

6    also to introduce the settlement administrator that was

7    appointed by your preliminary approval order of

8    January 25th, David Cohen.

9            **THE COURT:**  Mr. Cohen, good to have you here

10   with us, sir.

11           **MR. COHEN:**  Thank you, Judge.

12           **MR. NAPOLI:**  And on Zoom we have Mr. Matt

13   Garretson whom you appointed as the notice -- class notice

14   administrator.  So he's available to talk as well about

15   the notice issues.

16           Also on the phone is Mr. London, my colead.  And

17   he'd be available to talk if the Court has any questions

18   on the broader issues of any impact on the MDL.  And

19   Mr. Hunter Shkolnik, who is my partner and also the

20   additional class counsel along with Mr. Bilott, who is

21   advisory counsel and also class counsel, here in the

22   Campbell matter.

23           And, Your Honor, there are two motions on today

24   as you know, one for final approval of the Campbell class

25   and the second for approval of attorneys' fees and costs.

1    Mr. Woofter, Daniel Woofter will be arguing to the extent

2    and answer questions along with myself and Mr. Bilott, but

3    him primarily on the final approval issues and any

4    technical, legal arguments that might arise.  And I will

5    be arguing on the attorneys' fees and costs issue and

6    answer any questions that the Court may have.

7            And so to answer your question, Your Honor, with

8    regard to an overview of the Campbell case, the Campbell

9    case involves a class area that's defined by metes and

10   bounds in the settlement agreement and provided in the

11   final approval order just south of the Marinette facility,

12   which was originally the Ansul facility where the NRL

13   tested the original AFFF foam that was put together.  And

14   it subsequently became a Tyco site.  And then now it's

15   called the Johnson Controls site.  It's been there for

16   about a hundred years.  And they have a testing facility

17   behind their plant which they would go out and train and

18   use and test foam.

19           And as a result of that practice, there was

20   leaching into the groundwater, which ultimately made its

21   way down into the groundwater into the class area and

22   contaminated a number of private well owners.  And those

23   private well owners are represented by Ms. Campbell, who

24   is in that class area, her and her husband.

25           And the class was brought on behalf of the class

1    members seeking three forms of relief.  One was property

2    damage for the demunition in value of the properties

3    within that class area.  Two, for medical monitoring for

4    those types of claims from exposure to PFAS that result in

5    the need to monitor your health for the diseases that we

6    believe are related to PFAS exposure, to go to the doctor,

7    to get the appropriate testing over the years, to have

8    early detection of those personal injuries.  And the

9    personal injuries is the third claim for relief that we've

10   sought on a non-class basis for the Campbells and other

11   members in the community.

12       And so that -- this settlement here addresses

13   all three of those issues, resolves all three of those

14   issues, we believe, in a fair, adequate, and reasonable

15   way early on in the litigation.  When I say early on,

16   early on in that these cases probably would not see the

17   ability to actually litigate and go to trial for quite

18   some time.

19       And so the structure of the class is property

20   damage claim of $11 million; a claim exposure, what we

21   call medical monitoring, the defendants Tyco calls claims

22   exposure of $4 million; and then a non-class fund of

23   $2.5 million to address any claims that come as a result

24   of the notice or that are currently existing involving the

25   five enumerated personal injuries in the settlement

1    agreement.

2        **THE COURT:**  Mr. Napoli, let me ask you just in

3    terms of how these three elements of the settlement

4    interact with each other.  If a person files a value

5    demunition claim and there's a formula for that based upon

6    the level of PFAS in their well, and they file an exposure

7    claim for residents of their home, they are required to

8    sign a general release; is that correct?

9        **MR. NAPOLI:**  That is correct.  The defendants

10   have required, and that's typical in most settlements

11   where they're going to pay money, that there be a release

12   for property and exposure and personal injury, yes.

13       **THE COURT:**  Okay.  So the individual who -- so

14   let's say a person does not have one of the five

15   conditions, kidney cancer, testicular cancer,

16   pregnancy-induced hypertension, ulcerative colitis, and

17   there's a fifth, um --

18       **MR. NAPOLI:**  Thyroid disease.

19       **THE COURT:**  Thyroid disease.  Let's say someone

20   manifests one or more of those conditions, that claimant

21   can then apply to this personal injury fund for

22   compensation; is that right?

23       **MR. NAPOLI:**  If they currently have one of those

24   injuries, they can apply to the personal injury fund for

25   compensation, yes, Your Honor.

1      **THE COURT:**  Okay.  And if they do not have

2  one -- such a claim currently and they sign that general

3  release and later develop one of the five conditions, can

4  they bring an action at that point?

5      **MR. NAPOLI:**  If they sign a general release and

6  have those injuries currently and don't submit for

7  personal injury --

8      **THE COURT:**  No, that's not my question.

9      **MR. NAPOLI:**  I was going to finish.  I'm sorry,

10  Your Honor.

11      **THE COURT:**  Yes.

12      **MR. NAPOLI:**  They would have released those

13  claims.  If they have opted in, they will have released

14  those claims is my understanding.

15      **THE COURT:**  Yes, they will.  That's the release.

16  It's a general release.

17      **MR. NAPOLI:**  Unless -- unless, Your Honor,

18  they're below the age of 18 and a child, they would not

19  be --

20      **THE COURT:**  Unless the parent sought court

21  approval -- I mean, part of the exposure claim is you

22  could claim it for a child who lived in the place.  But

23  you'd have to have court approval for a minor settlement.

24  And if the parent was authorized to sign the release, they

25  could sign the general release, but that would require a

1     second court approval.  Is that fair?  I think that's

2     right.

3               So the answer is -- so if -- let's say someone's

4     part of the class and they say I don't want to sign that

5     general release, but they have not opted out.  And within

6     the time period provided to submitting a property claim,

7     they don't submit the claim because they don't want to

8     lose their latent -- their potential for a latent personal

9     injury claim, would that person then lose their right to

10    pursue property demunition?

11              **MR. NAPOLI:**  Yes, Your Honor.

12              **THE COURT:**  Okay.  And the personal injury

13    class, again, if somebody opts out, they're not subject to

14    the fund limiting them to 2.5 million, correct?

15              **MR. NAPOLI:**  That's correct.

16              **THE COURT:**  But if they do submit a claim under

17    the settlement agreement, the maximum exposure that the

18    defendant would have for any such claim would be

19    $2.5 million for all claims; is that correct?

20              **MR. NAPOLI:**  Correct.

21              **THE COURT:**  And Mr. Napoli, you've got some

22    experience with this one.  What's a toxic tort wrongful

23    death cancer case worth if it can be proven?  Great

24    variability, obviously, on age and all of that.

25              **MR. NAPOLI:**  Well, it depends.  And I can say

1   from my experience, you know, at least in this situation

2   in Marinette, we have canvassed the area multiple times,

3   both myself and Mr. Bilott.  We've also looked at the

4   likely incidents of a lot of these cancers.  So we have a

5   good feel from these 200-plus homes as to whether or not

6   there are these personal injury claims and what the

7   likelihood of there are going to be.  And it's been

8   consistent with what claim -- the number of claim forms

9   that are filed.

10           And I have resolved some personal injury cases

11   in the past.  And it's going to depend on looking at each

12   home, whether or not there's exposure at that home.

13   Because there are other causes of some of these injuries.

14           **THE COURT:**  Sure.  This is not a unique -- these

15   conditions are not unique to PFAS exposure.  The question,

16   though, I have is -- listen, the lawyers know much more

17   than I do about the potential merit of any of these

18   claims.  Y'all have given me just really the most

19   superficial exposure over -- we've mostly been doing

20   discovery related matters and not doing the underlying

21   merits.  So I don't know if you can prove or not prove

22   causation.  Those are always challenging in any toxic tort

23   case or any product defect case.  You always -- you've got

24   to prove -- when you've got a disease, you've got to prove

25   causation.

1            I'm going to confess to you, Mr. Napoli, I'm a

2    little perplexed why we have the personal injury non-class

3    in any way connected to this settlement.  I can understand

4    why the parties might want to negotiate a personal injury

5    settlement.  I get that completely.  And I can understand

6    why the defendant would want to foreclose future unknown

7    liabilities.  Mr. Petrosinelli wouldn't be doing his job

8    without trying to do that.

9            But the question in my mind is are we -- are we

10   actually doing a shadow class on the personal injury

11   claims?  That is, we couldn't class the personal injury

12   claims predominance, we couldn't get through Rule 23 and

13   that's why no one's trying that.  That's well known.  So

14   what we're really doing is, if you agree to accept a

15   property demunition claim as a class member, you are

16   required to agree to the limitations for your personal

17   injury claims set forth in the settlement agreement.  Is

18   that fair?

19            **MR. NAPOLI:**  Absolutely, Your Honor, yes.

20            **THE COURT:**  And I think that's essentially a

21   class.  I think you're classing the personal injury

22   claims.  That worries me.

23            I think the company's proposal concerning the

24   property demunition and the exposure claims are fairly

25   reasonable and imaginative in some ways.  I think of how

1    you deal with medical monitoring.  You're compensating

2    people for the risk of exposure.  You're basically giving

3    them the money to medically monitor.

4         I just want to tell you up front I've got some

5    concerns about the connection to the personal jury claim.

6    And from the beginning, I've been mystified why a

7    non-class fund is connected to a class settlement.  And

8    the answer I think is, and you're confirming this to me,

9    Mr. Napoli, is because it is essentially classed.  It is.

10   It's the price of getting -- participating in this

11   settlement is you've got to -- as a member of the class

12   you've got to give up in part your rights for personal

13   injury.  And you're limited to a fund that is finite.  And

14   it may be -- it may be that 2.5 million overcompensates

15   people.  I don't know.  I have no idea about that.

16        But the question is why not separate them?  That

17   is, why not do the two class matters independently?  And

18   then advise people in the area, we would -- we're, number

19   one, open for business to negotiate any current cancer

20   claims.  Sounds like y'all are already doing that?

21             **MR. NAPOLI:**  Correct.

22             **THE COURT:**  And for latent claims, we'll pay you

23   X dollars if you want to run the risk.  But say it up

24   front and don't condition it on anything else.  It's just

25   an individual decision.  And the good folks in Wisconsin,

1    this Wisconsin community, who want to be paid now for the

2    risk or want to wait would be their call.  I just put that

3    out there because that --

4            **MR. NAPOLI:**  Sure.

5            **THE COURT:**  -- some variation of that is

6    throughout many of these objections, not maybe articulated

7    quite as specifically as I've raised it but which I think

8    raises a concern.  I found the -- I've got to confess, I

9    don't think I actually read all 152 of them.  I skimmed

10   some after awhile because a lot of them had similarities

11   and some of them looked like they were maybe prepared by

12   the same person.  That's okay.

13           But I did get -- I did read everyone who is

14   speaking here very closely.  And I read a lot of the

15   others.  And I feel like I've -- I grasp the objections.

16   Some I think you're going to have some very good answers

17   for.  And some I think you're -- you go to this concern

18   about -- and it's articulated in different ways.

19           But, you know, I've always been hesitant, very

20   hesitant when lawyers come to me about settlements to try

21   to second guess their judgment because they know the case

22   and I don't know the case.  But I don't normally have a

23   situation where the client stands up and says -- and

24   that's what's happening here, it's at least 150 people

25   have stood up and said we don't think this is fair.

1          I've been doing this work for a lot of years,

2     both as a judge for over a decade and as a lawyer, I don't

3     ever remember this many -- y'all are more familiar in this

4     world.  Maybe having this number of objections is routine.

5     It's not in my court.  It's not been in my court.  And

6     I've had very large settlements in which I've presided

7     over, class settlements.

8          So not to say all their objections are valid

9     because I think many of them y'all have very good answers

10    for them.  But I wanted from the outset to share with you

11    my concern not with maybe in the end folks consciously

12    knowingly agreeing to release personal injury claims

13    separate from a class settlement and maybe would get

14    exactly the same result, but I'm concerned with the

15    structure here.

16         And -- okay.  With that --

17         MR. WOOFTER:  If I may, Your Honor, just to

18    quickly address?

19         THE COURT:  Yes.  Can you speak a little louder?

20         MR. WOOFTER:  I think with regard to the release

21    and it's -- it is not -- and defendants can confirm if

22    this is the case in this situation as well.  It wouldn't

23    be uncommon to release such claims even if there weren't a

24    separate fund for non-class personal injury claims if it

25    were just funds for property damage, it wouldn't be

1    uncommon to include such a broad release.  So in some ways

2    it's more --

3            THE COURT:  Yeah.  I've got to say, if -- that

4    may be true.  I am aware that some people are very willing

5    to sign general releases.  But this is pronounced to be

6    just a property claim -- a class is frankly for property,

7    frankly for medical monitoring described here as exposure

8    risk.

9            And it's not -- we couldn't class personal

10   injury.  So the effect here -- and I agree with you.  You

11   know, I was a litigator.  I did hundreds of releases,

12   sometimes on Mr. Petrosinelli's side and sometimes on the

13   other side.  Here in South Carolina we do both sides.  And

14   I was always very conscious of the scope of that release.

15   And when you can't class something and then you put a

16   general release, you're classing it.  That's basically the

17   effect here, though I'm fully familiar with the process.

18           You get an automobile liability case and people

19   will often give a general release.  They want to make sure

20   you're not suing some party associated with them.  But

21   it's not uncommon in those cases where someone says I'll

22   give you a release and anybody affiliated with you, but

23   I'm not giving the doctor or the hospital who treated me a

24   release because that's a completely separate case and

25   there's no consideration.

1          So I do think you put -- Mr. Woofter, you're

2    putting your finger on the problem here is the general

3    release with a limited class.  That's the problem is

4    the -- they don't match.  And I don't fault the defendant

5    for wanting a general release.  If I were in their shoes,

6    I'd be doing exactly the same thing.  But, you know, I've

7    got to look for the best interests of the class here.

8          **MR. NAPOLI:**  Your Honor, if I may just talk for

9    a second about the structure?  And while it's true, there

10   are a lot of objections -- and I've been practicing for a

11   long time, too, and held a lot of classes with a lot more

12   people with a lot less objections.  And so, you know, it

13   also concerns me.  But when you look at the objections,

14   the major objection that we're talking about is the issue

15   of piping the clean water --

16         **THE COURT:**  Yeah, let's not go off on that right

17   now.

18         **MR. NAPOLI:**  If I may finish, Your Honor?

19         **THE COURT:**  Go ahead.  But I'm just saying that

20   may be an issue which y'all have a point about.  We'll

21   talk about that in a minute because it's a core issue on

22   property diminishment value.  That I understand.  And I

23   don't want to interrupt you, Mr. Napoli, but I want to say

24   I don't want to chase that rabbit down because I think

25   y'all have a point there.  It is the connecting to the

1   personal injury that concerns me.

2       **MR. NAPOLI:** So there are a few objections as to

3   personal jury and certainly they can opt out. But I

4   wanted the Court to be aware though as well that we have

5   nine claims for personal injury that have been submitted.

6   And Mr. Garretson is, as I said, on the Zoom and he can

7   give the statistics as to the notice. And there are 320

8   claims for property damage that are submitted.

9       And I know very well and Mr. Woofter is from

10  Goldstein and Russell. And I've argued with his partner

11  at the Supreme Court on issues involving jurisdiction and

12  class. So I understand the issues very well. And there's

13  certainly a balance.

14      Here there is a clear opt out. If somebody is

15  concerned about a future injury and they do not want to

16  waive it, they do not have to accept the property claim.

17  They do not have to accept the monitoring. And they can

18  opt out and pursue that claim. The fact is no other cases

19  in four years have been filed in this jurisdiction. Only

20  the Campbell case has been filed and the Goldsmith case,

21  which was a personal injury case, which was resolved.

22      So these class members -- and in negotiating the

23  class with Mr. Petrosinelli, I understand that there's a

24  balance between whether or not to release a personal

25  injury claim. When you look at the market here in

1    Marinette, there was a four percent drop in property

2    values.  Here in this class people are going to get a

3    minimum of 60 percent of their property value.  So there

4    was a balance that had to be made by me as the lawyer --

5         THE COURT:  But -- but -- but you're going back,

6    Mr. Napoli, on the issue, which I agree with you on, which

7    is that this is, I think, a reasonable property

8    settlement.  It is the connecting of it and the way it is

9    done that concerns me.

10        It may be that if Tyco simply said we're

11   prepared, separate from this, to settle every personal

12   injury claim that anyone wants to assert, and if you're

13   willing to waive your latent claims, we'll pay you a

14   certain amount of money for that.  I think that is a

15   perfectly reasonable separate arrangement.

16        It is coupling this with the class that concerns

17   me, not the end result.  And it may well be that the

18   people will line up and say, give me X dollars, I'll give

19   it up, or they will just hold on to their right; that will

20   be their choice.

21        But if the answer was as long as people can opt

22   out, it doesn't matter what the settlement is, then we

23   wouldn't have a fairness hearing, we would just have an

24   opt out procedure.  I think we all recognize that many

25   people will be affected who don't have the means to bring

1   a lawsuit at this point.  But if they were to develop one

2   of these five conditions, they might well have one.  And

3   under the discovery rule, their statute of limitations

4   wouldn't be -- would not be -- would not have run.

5          Now --

6          **MR. NAPOLI:**  May I say, Your Honor, I think the

7   structure as exists handles that.  So if somebody does not

8   opt out, does not participate, and has a latent injury

9   that develops ten years from now, they can bring that.

10         **THE COURT:**  Absolutely.  But they have to give

11  up their right to pursue a property claim to exercise that

12  right.

13         **MR. NAPOLI:**  No, they can file a property

14  claim --

15         **THE COURT:**  No, if they file a property claim,

16  they then go -- then they have to give a general release.

17         **MR. NAPOLI:**  When I say -- they can file a

18  property case.

19         **THE COURT:**  Yeah, but nobody's going to do that

20  because of the cost of the lawsuit.  I mean, Mr. Napoli,

21  you have done, and I think the folks up there don't

22  appreciate the level of effort of your law firm and these

23  other lawyers in pursuing this case.  It is enormous.  It

24  is just amazing how much effort it has taken.  And it

25  highlights the value of MDLs and in some cases class

1  actions to bring justice to people who would otherwise not

2  have a remedy.

3  But, you know, the appellate courts have warned

4  us about not overdoing these class actions and prejudicing

5  the rights of people.  So I'm trying to find a way here to

6  navigate this.  And so I highlight to you again -- and you

7  say that only a few people have raised the coupling of

8  these issues, but they've said it in different ways.  They

9  say the fund isn't adequate.  There are all these

10 different issues.  The PI fund isn't adequate.  But there

11 really, when you get down to it, it's all this issue, why

12 is personal injury in the case?

13 Well, Mr. Petrosinelli, before I proceed to hear

14 from folks, is there anything else you wish to add?

15 **MR. PETROSINELLI:**  If I can be heard, Your

16 Honor?

17 **THE COURT:**  Yes.

18 **MR. PETROSINELLI:**  I think Your Honor might

19 imagine -- and I've represented plaintiffs and defendants,

20 as well.  They do that in DC some, too, not as commonly

21 maybe as South Carolina.

22 But on this, you might imagine, it's not a very

23 attractive proposition to a corporation to pay what I

24 think for these claims are substantial funds for property

25 and exposure claims and then have the next day people

1   turning around and suing you for personal injury.  It was

2   really at a crucial point of this settlement.

3          And I just wanted to give Your Honor the

4   perspective on why we did it that way and the amount.  The

5   amount obviously was negotiated.  But I think there's

6   really two things.  One is, as Mr. Napoli said, we just

7   didn't think there were going to be that many personal

8   injury claims.  And I think that's borne out by the claims

9   process.  You just heard Mr. Napoli say there's been only

10  nine, not including the Campbells, I guess.

11         And we thought it would be good to mirror the

12  settlement in the way the Campbells themselves brought the

13  complaint; that is, they have class claims but they have

14  their own personal injury claims that they included in the

15  complaint.  So we thought there weren't going to be that

16  many claims.

17         And the second thing we thought, and this gets

18  to the choice; and that is, that the testing and the

19  wells, which I know we'll talk about, reflects that

20  there's very, very few people that have any PFAS in their

21  wells.  Most of them have zero and some others have below

22  any regulatory limit.  There's very few people that have

23  levels above any regulatory minimum.  And the thought was

24  --

25         **THE COURT:**  How many -- has Wisconsin adopted a

1    level lower than the federal guidelines?

2         **MR. PETROSINELLI:** They have not adopted it but

3    it's below 20 parts per trillion.

4         **THE COURT:** Which is a little bit between some.

5         **MR. PETROSINELLI:** So what I'm saying is, just

6    to give you an idea of the data, there's been about 171

7    wells tested.  140 of the 171 were zero or below 20 parts

8    per trillion, that's 81 percent of the wells tested to

9    date have zero, most of them are zero.  111 are zero.  And

10   so we thought that if someone were making a choice, should

11   I participate in this settlement and take money for

12   property damage and exposure and I don't have a personal

13   injury right now, so I can't apply for the personal injury

14   fund, so I have to decide am I going to take this money

15   for property damage and exposure, or am I thinking, gosh,

16   what if I develop one of these injuries?  Most folks are

17   going to say to themselves, well, if I have zero in my

18   well --

19        **THE COURT:** It's a pretty good bet, you might

20   say.  And the company could well say we're going to pay

21   this amount of money and we don't think you're claim is

22   worth more than that.  And if you want to bring a personal

23   injury suit, have at it.  We don't think the risk is very

24   great proving it.  Even if you developed it that you could

25   prove it.

1          You know, I get your reasoning.  I really do.  I

2    get where everybody is coming from.  It's just linking

3    these decisions is doing something that I don't think we

4    can do, which is to class the personal injury claim.  And

5    I think we're effectively doing that.

6          And so I think this is fixable.  I really do.  I

7    know the companies said we'd like to lump them all

8    together and get rid of all these future prospective

9    claims.  I get that.  I don't fault them for wanting to do

10   that.  But linking it to a class action is a problem.

11   That's the issue.

12         And so, you know, in the end, maybe what

13   actually the company pays and what happens might be very

14   similar to what you've proposed but you're not doing a

15   shadow class doing it.  And it's just decoupling those

16   things.

17         And you're right, Mr. Petrosinelli, many people

18   may say, I have zero in my well.  And if I'm getting X

19   dollars, I'm probably being overpaid.  Of course, people

20   can have PFAS exposure more than just in their wells.  I

21   mean, they could potentially if it's in the community, it

22   can be in the groundwater, somebody mentioned their

23   basement.  I think these are tough claims.  I would warn

24   anybody opting out, and I say it right now, you better

25   have somebody ready to go if you're going to opt out

1   because you don't know how much work's been done by these

2   lawyers just to get where they are.

3          How many documents now, Mr. Napoli?  4 million

4   documents or something already?

5          **MR. NAPOLI:**  There's way more than that that the

6   plaintiffs have reviewed.

7          **THE COURT:**  It's amazing what's happened here

8   and the work done.  And the decision to opt out is a very

9   serious decision because I think the likelihood you can

10  get another lawyer who could remotely approach the

11  competence of these lawyers to litigate it would be a

12  stretch.

13         But saying that, how do you dispose of rights of

14  people for future injury?  And I understand that what Tyco

15  says is we'd like to have an absolute ceiling on our

16  exposure.  Who wouldn't?  But doing it by a class action

17  is problematic.  And if you don't -- you're not going to

18  be able to cap it if you don't have a class.  You're just

19  not going to -- you can't cap it.  And that's the benefit

20  of the class is that you're able to cap the exposure.  You

21  know, there's a finite fund.

22         Well, let me proceed to hear from our objectors.

23  And I believe the Baurs are actually in my courtroom.  Is

24  that correct?

25         **MR. BAUR:**  That's correct.

```
 1              THE COURT:  Welcome, Mr. and Mrs. Baur.  I'd be
 2    glad to hear from you.  Are you comfortable saying where
 3    you are?
 4              MR. BAUR:  Yes.
 5              THE COURT:  Very good.  I'd be glad to hear -- I
 6    want to make sure.  Are we picking them up on a
 7    microphone?  Because I know people that are listening are
 8    not going to --
 9              THE COURT REPORTER:  No, sir.
10              THE COURT:  Crystal, is there a remote mic or
11    anything I can hand the folks?  I don't want them to have
12    to come to the podium if they don't have to.
13              THE CLERK:  I don't think so.
14              THE COURT:  Mr. Baur, why don't you just come to
15    the podium here, sir.
16              THE CLERK:  And I need to unlock the phone line
17    to allow one person to join.
18              THE COURT:  Yes, take your time.
19              THE CLERK:  When they join, I'll lock it back.
20              THE COURT:  Okay.  I think we're okay.
21              Mr. Baur, welcome to Charleston, South Carolina.
22              MR. BAUR:  Thank you.
23              THE COURT:  I hope -- did you drive or fly?
24              MR. BAUR:  Fly.
25              THE COURT:  Okay.  That's a little better than
```

1    driving.  Okay.  So share with me your concerns, sir.

2         **MR. BAUR:**  I shall.  Again, my name is Jim Baur.

3    My wife Cindy and I have lived in the Town of Peshtigo

4    since 1981.  The source of information that I have

5    regularly comes from the Wisconsin Department of Natural

6    Resources.  They have held a series of listening sessions

7    on this subject.  They have documented their listening

8    sessions with slides of their presentation.  And my

9    conclusion is the future spread of PFAS in our groundwater

10   is not known.

11        In the Wisconsin DNR listening sessions slides

12   dated January 20th of this year, '21, Tyco provides A Path

13   To PFAS Solution.  Slide 28 is titled Where Is The PFAS?

14   It shows concentrations greater than 100,000 parts per

15   trillion moving predominantly to the east.  You can only

16   scale the size of this off the slides provided but it

17   seems to be a very large area.

18        The Wisconsin DNR listening session dated

19   March 17th of this year provides Tyco's information on a

20   proposed groundwater extraction system they term Yes.

21   Slide 20 titled Excerpt From Appendix B Of JCI Remedial

22   Action Plan Report shows the PFAS groundwater

23   concentration and plume size for the current year and what

24   they propose it to be after treatment for 10, 20, and 30

25   years.  For some reason the plume size now exceeds 16,000

1    parts per trillion versus 100,000 parts per trillion.  The

2    size is approximately equal to the area of the Tyco Fire

3    Technical Center property.

4           In one study, this plume is moving to the east.

5    Yet, in the other study, they assume it's stationary so

6    they can treat it.  It's not credible to a layperson.  I'm

7    an engineer, but it's not credible to me as a layperson

8    that a highly concentrated plume area will not migrate and

9    cause further damage to the wells, wildlife, and fish.

10          THE COURT:  Mr. Baur, in your objection, I

11   believe you also stated you were opting out of the

12   settlement; is that correct?

13          MR. BAUR:  We did opt out.

14          THE COURT:  So you're among those who have

15   looked at this and said, listen, I'm just going to take my

16   chances because I'm worried about future risk.

17          MR. BAUR:  Correct.  And just to clarify, my

18   wife will clarify it better, but we had owned a property

19   which we no longer own in the settlement area within the

20   specified time period.

21          THE COURT:  But you would not receive under the

22   settlement your property -- any property compensation,

23   you'd have to pursue that separately.  You understand

24   that?

25          MR. BAUR:  Yes.

1    THE COURT:  Well, tell me, if you're opting out

2    and you seem well informed.  You've attended meetings.

3    You're an engineer by training, so you have some

4    understanding of this type of data.  Why wouldn't just,

5    you know -- why would those who wish not to participate

6    opting out not be the solution so people who want to do

7    this deal would have the privilege of doing it?

8    MR. BAUR:  I don't wish to prohibit anybody from

9    taking the promised damage allotment.  My concern is not

10   so much for us, it's for our young women and their

11   children, our grandchildren.  We have this huge plume of

12   contaminated area.  A logical person would not believe

13   it's just going to stay there for the next 30 years.  A

14   logical person would believe that there's some level of

15   treatment that this extraction system can bring it down

16   to.  However, the lower the density gets of the

17   contaminant, the more water you need to treat and treat

18   and treat to get more product help.

19   THE COURT:  Now there is -- are you aware that

20   recently the Wisconsin DNR approved the remediation plan

21   of Tyco?

22   MR. BAUR:  Yes, I am aware they approved that.

23   THE COURT:  What's the significance of any of

24   that in regard to your concerns?

25   MR. BAUR:  Well, I think it's the right path

1    forward.  But the concern is it takes -- the treatment

2    cycles off in 30 years.  So what is happening --

3            THE COURT:  Is there any --

4        (Indiscernible crosstalk.)

5            MR. BAUR:  What's happening to my grandchildren

6    during that 30-year span?

7            THE COURT:  Well, of course, your grandchildren

8    aren't being released.  They would still potentially have

9    claims, would they not, under the settlement?

10           MR. BAUR:  Well, I just want to make sure that

11   everybody understands that.

12           THE COURT:  Yeah.  The women you were talking

13   about potentially would have their -- I mean, if they

14   don't opt out of the class, they would lose their property

15   claims.  The children would not because you can't -- the

16   child's --

17           MR. BAUR:  Right.

18           THE COURT:  You can't extinguish the right of a

19   child without court approval.

20           MR. BAUR:  My concern is in listening to the

21   class counsel speak in their Zoom meeting session, I don't

22   believe that they offered people an assessment of what the

23   risk of the various cancers are, what the probability is,

24   and what the cost is of treating those.

25           THE COURT:  Yeah, and let me say this.  Some of

1    this is they asked you, honestly, they don't know because

2    a lot of this is unknown.  Just like we've all found on

3    COVID, how you do things -- we're just beyond knowledge to

4    be able to really fully assess this.

5           But you heard a little bit from Mr. Petrosinelli

6    that 81 percent of the people had less than 20 parts per

7    trillion in their wells.  Now, you mentioned to me --

8           MR. BAUR:  Your Honor, that's to date.  To date.

9    What is it going to be ten years from now?

10          THE COURT:  It's a fair question.

11          MR. BAUR:  And Tyco has not taken the

12   responsibility to take a testing of wells over a long

13   period.  They haven't been involved with this over a long

14   period.  How is that number changing?

15          THE COURT:  Yeah, I mean, the -- I mean, I noted

16   as you did that we're talking about a 30-year remediation

17   plan with the state, which is a substantial, you know,

18   engagement that Tyco is going to have with the community

19   just on this issue.  But I did note that DNR said it

20   doesn't really directly involve the treatment of any

21   wells; that the wells themselves are not part of -- the

22   treatment of private wells is not part of this settlement

23   with the state.

24          MR. BAUR:  Correct.

25          THE COURT:  So --

1        **MR. BAUR:** But my treatment system that I may

2   choose to put on my private well is independent of the

3   discussion of what happens to this large plume of

4   contaminated water over the next 30 years.

5        **THE COURT:** So let me understand what you -- and

6   I'll see if the lawyers have some response as well to

7   this. This plume with 16,000 parts per trillion, where is

8   that? Where is that physically?

9        **MR. BAUR:** That is physically under the Tyco

10   fire training facility. It is under their property and

11   off to the east of their property.

12        **THE COURT:** How far off?

13        **MR. BAUR:** It overlaps. It's about two-thirds

14   on, maybe a third off.

15        **THE COURT:** How far does this plume go distance

16   wise? Are we talking a mile, a block? I mean, how --

17   quarter of a mile?

18        **MR. BAUR:** My best guesstimate from looking at

19   the slides and, you know, the size of the treatment plant,

20   my best guess is 1 to 200 acres.

21        **THE COURT:** And are there private wells within

22   that range or are they outside of that?

23        **MR. BAUR:** No, outside of that range.

24        **THE COURT:** Okay.

25        **MR. BAUR:** My concern is this stuff isn't going

1    to stay stable.  It's not a piece of gold sitting under

2    the ground.  It's mobile.

3           THE COURT:  So if I were to approve this would

4    you advise people to opt out as you have?  Would that be

5    the proposal?

6           MR. BAUR:  If somebody were to ask me, and they

7    did have children or grandchildren living with them, I

8    would advise them to opt out.

9           THE COURT:  Now, let me ask you this.  If you

10   did not have as a condition of applying for property

11   damage that you had to agree to waive, release your future

12   disease case claim, would you file yourself a property

13   claim if that was the only issue for exposure and for

14   diminished value?  Would you apply for that yourself?

15          MR. BAUR:  I don't understand, sir.  If it were

16   only for the property, I -- I would not have an issue with

17   that.

18          THE COURT:  I mean, would you -- my question is

19   this, is the fact that you're trying to preserve your

20   future claim causing you not to apply for your property

21   diminishment claim under the class action?

22          MR. BAUR:  Well, please understand, we no longer

23   own the property in the settlement area.

24          THE COURT:  Mr. Petrosinelli, it still applies,

25   doesn't it?

1      MR. PETROSINELLI:  Yes, Your Honor.

2      THE COURT:  Yeah.  So you would have a right to

3   do that.  But if you do it, you give up your latent

4   defect -- your latent disease claim.

5      MR. BAUR:  Right.

6      THE COURT:  And I'm just asking you, if you

7   didn't have that condition, would you pursue -- if you had

8   a right to property diminishment, would you pursue it?

9      MR. BAUR:  Honestly, Your Honor, my wife has

10  been much more involved in that aspect.  I'll let her

11  speak to that.

12     THE COURT:  Okay.  Okay.  Well, thank you, sir.

13  I really appreciate you coming.  If your wife wants to

14  step forward and have anything else to add, I'd be glad to

15  hear from her.

16     THE COURT REPORTER:  Could you ask them to mute?

17  Somebody on the line is --

18     THE COURT:  Could I ask on the line somebody

19  needs to mute.  We're hearing people and it's distracting

20  in the courtroom.

21     Yes, ma'am, Mrs. Baur?  Glad to hear from you.

22     MS. BAUR:  I'm Cindy Baur.  One thing Jim had,

23  when we were listening to -- or at a DNR listening

24  session, a friend of ours was with us and he's 70 years

25  old.  And they nudged each other and said, So, what's a

1    70-year-old testicle worth?  And he said -- you know, they

2    chuckled about it.  However, it's not so funny for truly

3    in the big picture of things because there were kids in

4    high school with testicular cancer.  Marinette is a cancer

5    hot spot.  And so it's not so funny, although in their

6    context --

7             THE COURT:  Furthermore, many people with

8    testicular or kidney cancer aren't so lucky to have it

9    contained to a single organ.

10            MS. BAUR:  Yes.  So I'll start on mine.

11            I'm Cindy Baur.  And I'm a resident and elected

12   supervisor of the Town of Peshtigo.  There are few things

13   in life we need to survive.  I need food, water, and

14   faith.  JCI has poisoned our water with a forever chemical

15   called PFAS.  It is measured in parts per trillion.  Over

16   20 parts per trillion is considered a health risk.  The 20

17   parts per trillion is the equivalent of one drop of water

18   in an Olympic-sized swimming pool.

19            THE COURT:  You must have been hearing my

20   argument.  I said that early in the case and everybody had

21   to acknowledge that that was probably true.

22            MS. BAUR:  Yes.

23            THE COURT:  It's very small numbers.  We're

24   talking about very small numbers.

25            MS. BAUR:  It is very small numbers.  However,

1    for children, infants, they say even one is too much.  So

2    as a forever chemical, it stays in your body and your

3    water.  You can't see it and wouldn't know it was in your

4    water.  But JCI released it into ours.

5            PFAS is linked to five conditions including

6    cancer and more illnesses not yet confirmed.  It has been

7    spread on our farmlands and goes into the food we grow and

8    the animals we feed.  It's our wildlife and our fish.

9    It's in our bay water, which is part of Lake Michigan.

10           It continues to spread and will still be

11   spreading after 30 years of the JCI proposed filtering.

12   The people in the Town of Peshtigo all had to either drill

13   wells or sand points to receive water.  So our water comes

14   from groundwater and not a municipal source.

15           PFAS has spread well beyond the settlement area.

16   And just to be clear, there was an initial test area that

17   the Campbell suit came.  Then it was expanded to a

18   settlement area that included a larger area.  Although JCI

19   never admitted to their PFAS being in that expanded area,

20   it is part of the settlement area.  I will not live long

21   enough to see the PFAS out of our water but will only live

22   to see the spread continue.  This settlement is not nearly

23   enough.  We deserve clean water.

24           To this day, class counsel has not contacted me.

25   I read the settlement twice completely before I realized

1    we were even part of it.  We have opted out of this

2    because it leaves us with poisoned water, food we can grow

3    and not eat, and a lack of faith that class counsel and

4    JCI will do what's right for the people of the Town of

5    Peshtigo.

6            THE COURT:  Let me ask you this.  There is

7    contamination that we can't turn the clock back and stop.

8    So we've got to deal with reality.

9            MS. BAUR:  Yes.

10           THE COURT:  And we're dealing with a situation

11   where it is enormously difficult to litigate one of these

12   cases.

13           MS. BAUR:  Yes.

14           THE COURT:  And, you know, I know that sitting

15   there in the community where your water has been affected

16   by this is -- gives you a certain perspective that I

17   respect.  There is another perspective which also I've got

18   to consider, and that is that these cases are so expensive

19   to litigate.  If we don't figure some way in which we can

20   efficiently settle them, many people, though they may have

21   claims, will never be able to get a penny.  It's just

22   too -- what lawyer would take this on on a single case or

23   even a group of cases?  The lawyers here are handling

24   thousands of cases.  And only then does it become

25   economically reasonable to even litigate a claim.

1            So one of the realities here is for the folks in

2    your community is they may opt out, which they have every

3    right to do if a settlement is approved.  But the reality

4    is there may not be a practical way to litigate their

5    claims.  That is the concern I have, is what is the -- on

6    the practical side, everything you say I can fully

7    understand and appreciate.  But if you have no one to

8    litigate your claim, and if somebody, that young mother or

9    child develops a condition, if it's serious enough,

10   obviously, perhaps that might be a lawsuit.  But the more

11   common lawsuit coming out of, say, pregnancy-induced

12   hypertension, which may be transient, the only way it was

13   ever going to be compensated is probably through some kind

14   of settlement, some kind of large settlement.

15           I'm just saying that that's just a reality that

16   concerns me, taking everything you and others have said,

17   legitimate concerns that you have is -- and you're taking

18   a course which makes plenty of sense to me.  You're opting

19   out.  I'm, frankly, more concerned about the people in the

20   class and their rights to be fairly adjudicated.  Because

21   I can feel confident that you and Mr. Baur are going to be

22   okay because you've made the decision to opt out.

23           **MS. BAUR:**  Your Honor, we opted out because we

24   have -- the property that we no longer own and was in the

25   test area is -- we sold long enough ago that it is -- we

1    have no effects over it.  However, we own a property that

2    is two houses outside of the settlement area that's

3    contaminated.  We don't live in that house.  But we own

4    another property that we do live in that when this plume

5    spreads we could be contaminated.  If we give up our

6    rights to this now, we have no rights for the people that

7    live in the other house or for ourselves.

8              THE COURT:  Well, that's my concern about the

9    general release, that there perhaps is a path here.  I

10   mean, you say -- I don't know when you sold the property

11   that was within the test area.  But if I understand the

12   settlement, you may be eligible for some compensation.  I

13   don't know.  But the price of that is you have to give up

14   your right for future claims.

15             MS. BAUR:  Yes.

16             THE COURT:  And the concern I have is the

17   connection of those two.  You might, you know, -- it

18   sounds like to me, you and your husband wouldn't on a bet

19   give up your right because you're worried about the

20   future.  That's a reasonable economic decision on your

21   part.

22             But the question is is the settlement for people

23   who would choose -- who do not opt out, is the settlement

24   fair, reasonable, and adequate?  That's what I've got to

25   ask.  Do you see what I'm saying?

1      **MS. BAUR:** Yes. I also represent the people in

2    the Town of Peshtigo through my position on the town

3    board. And this is very concerning to a lot of people.

4    And this is -- that's why we made the trip here today.

5          **THE COURT:** I appreciate that you came. Thank

6    you.

7          **MS. BAUR:** And I'm very grateful that you are

8    hearing us as the residents there and our concerns.

9    It's -- it means a lot to us. Thank you, Your Honor.

10         **THE COURT:** Thank you very much. Thank you,

11   Mrs. Baur.

12         Okay. Mr. Petrosinelli, if I could just ask you

13   this. Talk to me a little bit about the movement of the

14   plume and sort of the companies -- and I know y'all have

15   hired engineers and so forth and tried to estimate some --

16   you know, how quickly it will spread and how it will

17   spread and so forth. What can you share with me about

18   that?

19         **MR. PETROSINELLI:** Yes, thank you, Your Honor.

20   I'm glad you asked because I was going to pipe up. I

21   think one thing that's crucial to understand is that this

22   GET System, groundwater treatment system that DNR has just

23   approved, not only does it extract the groundwater, clean

24   it and put it back in the environment of PFAS, but it

25   hydro-geologically stops the spread of the plume. That's

1    the key, that it's not just a treatment system in the

2    sense of treating the groundwater that does have PFAS in

3    it but it stops the spread of the plume.  So in terms of a

4    future issue, that is what takes care of the

5    plume-spreading issue.

6         The second thing to realize is that Tyco did

7    fire foam testing at this facility for 40 years.  It

8    stopped in 2019, outdoor testing.  And so in terms of

9    thinking about the future, whatever foam got in the

10   ground -- in the groundwater over the 40 years prior to

11   2019, it would have already -- whatever it did, it did.

12   But there's no ongoing releases into the environment.

13        **THE COURT:**  Tell me about these wells which are

14   20 or great -- have PFAS at 20, how proximate are they to

15   the Tyco facility?

16        **MR. PETROSINELLI:**  They're -- it's varying

17   lengths.  It's a relatively, I would say -- I'm just ball

18   parking it, but most of them that are in that range, above

19   20 parts per trillion, are southeast of the facility,

20   which is right where part of plume goes.  So you would

21   expect it to be.  And, you know, maybe a half mile or so.

22   And so it's a very small number.

23        I don't know if I gave Your Honor the numbers.

24   But the number's over 20 parts per trillion, between 20

25   and 70, there's 13 homes.  And over 70, there's 18 homes.

1    And those are the folks who you really --

2         THE COURT:  Give me those numbers again.  I'm

3    sorry.

4         MR. PETROSINELLI:  Between 20 and 70 parts per

5    trillion -- so actually between 20 and 69 parts per

6    trillion would be 13, and 70 and over is 18.  And then,

7    remember, 140 are below the 20.

8         THE COURT:  Yeah.

9         MR. PETROSINELLI:  So that makes up the 171.

10        THE COURT:  Well, you know, the company's trying

11   to limit its liability.  It believes it's going to limit

12   the spread of the plume through this system, which I know

13   DNR praised the system.  They thought it was pretty

14   imaginative.  And you only have 31 homes right now and you

15   discontinued the testing in 2019.  Then the company's

16   potential exposure -- I mean, if people say, well, I'm not

17   going to waive my latent claim, doesn't sound like the

18   company has a great deal of risk by telling people we're

19   willing to pay you X dollars for a release today.  But if

20   you don't want it, it's your business -- that's your

21   business.  Nobody -- I mean, practically speaking, I think

22   the potential exposure to the company for someone to

23   successfully sue you is pretty low.

24        MR. PETROSINELLI:  Well, that he would be the

25   hope.  I think that Your Honor's point is right, which is

1    I think it's a shame if folks opt out from the settlement.

2    Because Your Honor's point about what lawyer is going to

3    take a case that -- where someone in a well has --

4            **THE COURT:**  Well, let's look at that for a

5    second.  If somebody had a claim a number of years from

6    now of a cancer that was metastasized and Stage 4 and they

7    were very ill, and they had a history of PFAS in their

8    wells, you and I both know y'all would be settling that

9    case, I mean, just practically speaking if a capable

10   lawyer did that.  That could be a far in excess of the

11   2.5 million you've set aside.  Nobody's arisen like that

12   to my knowledge, no claim like that has arisen and may

13   never arise.

14           But what worries me -- you know, in class action

15   settlements, one of the wraps is some people get

16   overcompensated and some people get under-compensated.

17   And in the end sort of justice is done, that's the theory.

18   It's kind of a compromise for efficiency.  And I get that.

19           We just can't do that for personal injury

20   claims.  That's my concern.  We can't class personal

21   injury claims.

22           And it may well be that for the overwhelming

23   majority of people, no matter what their concern is right

24   now, the only money they would ever likely see is if they

25   accept this settlement.  I mean, just realistically.  But

1    that's their choice.  And do I have a right to take away

2    their -- and put them in a deal where they have to make a

3    Hobson's choice?  Do I have to do that?  Or is there a way

4    with these smart lawyers in this courtroom we can figure

5    out a smarter way that doesn't seem to have a shadow

6    class?

7              I think the end result is probably reasonable.

8    It's just it's done in a way in which it makes people give

9    up rights that I don't think I have a right to make them

10   give up.  I don't think I should have a right to put them

11   in that position.

12             **MR. PETROSINELLI:**  Your Honor, I've known you

13   long enough to know that when you have a concern about

14   something, I can try to talk you out of it.  But I

15   think --

16             **THE COURT:**  I want to talk you into working out

17   something that serves the interests of all the clients, of

18   everybody, and addresses some of these legitimate concerns

19   the good people of this area have.  Because I think, on

20   balance, there's much good in this settlement proposal.

21   We've just got to figure out a way to do it that doesn't

22   take us afoul of basic rules about not classing personal

23   injury claims.

24             **MR. PETROSINELLI:**  Well, I think one thing I

25   agree with you, Your Honor, about the following.  These

1    300 or so folks that have filed claims to participate in

2    this settlement, including almost all the folks who have

3    the high numbers in their wells, but certainly the people,

4    the vast majority who have zero in their wells, this is

5    their one and only chance to get compensated through a

6    class settlement.  And it would be a shame if it didn't

7    happen I think.

8         THE COURT:  Yeah, I think it's going to happen.

9    The question is how do you make it work in a way that

10   doesn't do this linkage?  And it may well be that those

11   people with PFAS in their wells who say, okay, we're going

12   to let you join the property claim and the exposure claim,

13   whatever amount of money, $15 million in those two funds,

14   that's the class, and the release would only be for that.

15   We would like to talk to you about paying you for your

16   risk of latent injury.

17        MR. PETROSINELLI:  You could do it that way.

18        THE COURT:  You could do it that way.

19        MR. PETROSINELLI:  Yes.

20        THE COURT:  And I suspect most people not linked

21   would make the conscious choice to do it.  But linking

22   them is the problem.  And then they have a separate

23   independent judgment that that is the right thing for them

24   to do and not making them having to balance one interest

25   off against another interest and effectively classing the

1    PI claims.

2           It may well be that the company would pay the

3    same amount of money, the plaintiffs would recover the

4    same amount of money, all of that would be the same.  It's

5    just how you structure it a way that you don't take away

6    the people's right to choose.

7           **MR. PETROSINELLI:**  Your Honor, did you want me

8    to talk about the one other thing that has kind of been

9    brought up as a municipal water line?  Did you want me to

10   talk about that or do you not want me to address that?

11          **THE COURT:**  Yeah, let me say something about

12   that and I'm glad to hear more folks, if needed.

13          You know, on one hand the company makes the

14   point that this is not a lawsuit to establish municipal

15   water in the community and that there are policy choices

16   the community needs to make.  Some favor and I understand

17   some don't favor the municipal connection.  And if I

18   understand, Tyco is prepared to spend millions of dollars

19   to pipe the water there.  Am I right about that?

20          **MR. PETROSINELLI:**  Yes, Your Honor, the current

21   estimate is between 17 and $22 million.

22          **THE COURT:**  Yeah, I mean, they're willing to do

23   it.  But then the folks would be part of the town,

24   apparently, the town with the water system.  They'd have

25   to agree to be annexed.  And then they would have a water

1    bill, which they don't have a water bill now.

2        And that's a choice that Tyco -- you can't

3    burden Tyco when people say, well, you know, I don't want

4    that either.  Well, okay, how does all that work?  And,

5    you know, Tyco has said, you know, we're voluntarily,

6    though we're not bound to continue to provide bottled

7    water and/or filtering, which has a cost as well.

8        And I get it that part of the property

9    diminishment value is you're being compensated for that.

10   That is -- and if you want the municipal water, well, Tyco

11   will contribute to that.  Those are reasonable choices.

12       It might well be that you might solve some of

13   these concerns by extending out, not voluntarily, but

14   agreeing to continue to provide bottled water and the

15   filtering in a way that's not voluntary, that you'll just

16   commit to doing it for some fixed period of time.  But all

17   that is something that could be worked out.

18       But I don't think you can hold Tyco responsible

19   when it's offering to spend $22 million for piping to say,

20   well, I don't want that.  Well, some say I want it and

21   some say I don't.  And you're kind of holding Tyco hostage

22   when it's actually a local concern independent of them.

23       There is a solution, a potential solution here

24   with the municipal water supply that's probably worthy of

25   consideration.  But that's for the decision of the folks

1    in this community and not for this Court to make.

2          And there's no lawsuit.  Mr. Napoli could bring

3    these lawsuits all day.  He can't make Tyco provide or not

4    provide the water from the municipal -- that's not the way

5    the court system works.  It's damages.  It's a damage

6    lawsuit.  And they're seeking compensation for it.

7          I think I've articulated the views here.  And I

8    think it's one of those issues I think that is a little

9    bit of a chasing a rabbit.  It's not relevant to the case.

10   But people need to understand if I approve this

11   settlement, they -- when they get their property

12   diminishment payment, that is for their loss of whatever

13   damage arises from the contamination of their wells.

14   That's what they're being paid for.  If it's not enough or

15   you want to bring another lawsuit, that's your business.

16   You're like the Baurs, you opt out.  But that's the

17   proposal.

18         And where I can imagine a personal injury claim

19   being brought if someone had a catastrophic injury

20   complication they claim is related, that is a conceivable

21   thing.  It is almost inconceivable to me that someone

22   could marshal a lawsuit over their diminished property

23   value.  I mean, the cost of litigation would exceed it.

24   That's why their proposal, the property proposal is

25   probably the only way in which compensation occurs.

1          And, you know, some people could say I don't

2     think it's enough.  I counseled a lot of clients who would

3     tell me that.  And I would say, well, you might get zero.

4     You know, that's a lot more than zero.  And you've got to

5     make a choice and you've got to live with your decision.

6     It's your call.  Nobody can make you -- Mr. Napoli cannot

7     make you not opt out.  You can opt out.  That is a right.

8          So even if the parties get together and figure

9     out a little fix on this problem with the coupling, you're

10    still going to be back to this issue that the water --

11    there's no permanent solution to the water right now.  The

12    lawsuit, there's a damage lawsuit that you've been offered

13    this money.  You can take it or not take it, that would be

14    your call.  You can opt out or not opt out.

15         Yes, sir?

16         **MR. WOOFTER:**  Your Honor, I wanted to address a

17    little bit the idea of coupling and the idea of the shadow

18    class to see if I can maybe explain in two different ways

19    I think the issues you're raising and you can correct me

20    if I've misunderstood.

21         With regard to the non-class personal injury

22    claims are twofold.  One is is this proper for the Court

23    to do at all as a legal matter?  And two, is it fair,

24    reasonable, and adequate to do so in the way that this

25    agreement does it?

1        And I think what the response to the first

2   question of whether it's proper to do it at all, I do have

3   some authority that I would like to share with the Court

4   that suggests it is proper in a class settlement to

5   release a non-class claim, potentially even a claim that

6   could not be brought for a class.  So I'll start with this

7   case, TBK Partners out of the Seventh Circuit.  And that's

8   675 F.2d 456.  And there the court said, To achieve a

9   comprehensive settlement, the court may permit the release

10  of a claim based on the identical factual predicate as

11  that underlying the claims in the settled class action

12  even though the claim was not presented and may not have

13  been presentable in the class action.

14        More recent --

15      **THE COURT:**  Not presented?  This one is

16  presented.  This claim is presented in the case.  It's not

17  one that you're saying I'm -- I just want to make sure

18  we're getting rid of all -- releasing all the claims.

19        What concerns me here is this is very much a

20  claim.  And you're conditioning, conditioning the exercise

21  of your joining the class of not opting out of the class

22  to give up a claim you have already asserted.  That is my

23  concern.

24        And, you know, you haven't been around me as

25  much as Mr. Petrosinelli has.  I've thought pretty deeply

1    about this.  And it is a very practical concern.  I spent

2    a lot of time going to MDL conferences and class meetings

3    with my colleagues.  And this, I want you to know, this

4    issue is very central to our concerns, this issue of

5    jamming claims into people -- making them make choices

6    that are unrelated.  You know, I'm just not comfortable

7    with it.

8           But I think it's fixable.  I really -- I think

9    there's a way in which y'all -- if y'all spent not as much

10   time arguing with me about it and figuring a fix, I think

11   there's a really easy fix here.  And I've already

12   suggested the path.  You separate them and people can make

13   their own choices separate.  And they may make the choice

14   that Mr. Petrosinelli says he thinks they'd probably make,

15   it might well be.  And those who don't will probably never

16   get any recovery.  I say that now, but I warn them, the

17   opt out people may never get recovery.  But they may have

18   the comfort that if they have a catastrophic result, they

19   have a right here and that's worth not being compensated.

20   These are intelligent people.  They make informed economic

21   personal decisions.  And they should have a right to do

22   that.

23          **MR. NAPOLI:**  Your Honor, if I may?  We certainly

24   hear you.  And we have a motto in our office to make our

25   clients money not law.  Because most of our clients could

1    care less if we change the law and they're really

2    interested in getting compensation.

3         And one of the things that I appreciate about

4    Mr. Petrosinelli that he's willing to have these

5    conversations early on, not at the courthouse steps where

6    we're waiting for a jury to be impaneled, but early on in

7    the process.  And there are not many lawyers that would

8    make that commitment early on.

9         **THE COURT:**  I want the folks who are listening

10   to this to understand.  For some reason, I get dragged

11   into these national cases.  I don't know why I've been so

12   honored.  And I've been around really, really good

13   competent lawyers in complex litigation.  The Department

14   of Justice asked me to do some.  And I've done some in the

15   Multidistrict Litigation.

16        And the lawyers in this case are the best

17   lawyers on both sides that I've ever dealt with.  And I

18   think the world of them.  It doesn't mean we always agree

19   with each other.  There will be times we don't.  But they

20   have really been diligent on both sides.  And they're

21   doing an excellent job representing their clients.

22        These are complicated issues.  Some of them are

23   at the very frontiers of our knowledge of science and

24   medicine and the effects of chemicals, some of them -- the

25   Baurs called them forever chemicals, probably a fair

1    description.  How we deal with that, that's all real

2    important.

3           But I don't want people to say I'm going to opt

4    out because I think the plaintiff's -- the class lawyers

5    are a bunch of thieves.  They are not a bunch of thieves.

6    They are actively working on this.

7           Tyco, obviously, is responsible for the PFAS in

8    the water system and is trying to fix -- find a way to fix

9    it.  We can't turn the clock back.  If we could, Tyco

10   would be at the front of the line trying to do that.

11          So how do we do justice here?  And justice isn't

12   perfect.  Justice is a balancing of interests.  And in

13   some ways I say part of this is like the knobs on the

14   machine.  You just want to get the knobs exactly right to

15   make it work to do justice.  There's no perfect justice.

16   What the surgeons say, the enemy of the good is perfect.

17   We're going to try to do good here.  So --

18          **MR. NAPOLI:**  Your Honor, if I could?  So I just

19   wanted to let you understand a little bit of the process.

20   And I appreciate and I certainly hear you and I know

21   Mr. Petrosinelli does, too.  We, very early on, I and our

22   team in our office is now trying to identify cases where

23   we might have an opportunity one on one with a defendant

24   to try to put together a structure that eventually may be

25   utilized in other areas of the country.  And this was a

1    unique situation.  And Mr. Petrosinelli was a partner in

2    that.  And this conversation certainly came up in the

3    negotiations, this issue that you raise.  And there was

4    argument and vigorous argument about whether or not to

5    include it within the release -- and I don't want to go

6    too far with negotiations -- whether or not to include

7    within the release this issue.  And my concern is, and I

8    hope he continues to participate, is that there was give

9    and take on this issue.

10           THE COURT:  Well, that's right.  And I think

11   there are ways, imaginative ways in which you can work

12   around that by separating them and the parties accomplish

13   the very same objective.  I just think the way you

14   structure it here is problematic.  But I do think there

15   are ways to fix this.  And I think you're on the right

16   track.

17           But as you say, we're in the middle of a

18   Multidistrict Litigation that covers almost every judicial

19   district in the country.  And we want to get this first

20   settlement right.  We want to fine tune it so it might be

21   a model in some ways to do other places.  And we don't

22   want to get off on the wrong foot here.  And so we -- I

23   think it invites a level of scrutiny and thought.  And

24   those folks among your team who are questioning whether we

25   should couple them, tell them they were right.  They were

1     right.  And then, you know, I've just got every confidence

2     that, you know, with the ground rules as we're talking

3     about them, this is fixable.  I really believe this is

4     fixable.  And we've just got to think it through.  And

5     it's not -- it may not be Tyco's perfect solution but

6     perfect is the enemy of good.

7               Okay.  Let me hear -- I want to hear.

8          MR. NAPOLI:  Your Honor, just before --

9          THE COURT:  Yes?

10         MR. NAPOLI:  -- may I just raise a couple other

11    issues that may help with some of the future objections as

12    well?

13              THE COURT:  Yes.

14         MR. NAPOLI:  First, I just want to thank the

15    Baurs for attending and putting forth their comments.  As

16    they did indicate though they are former owners.  And they

17    did indicate a couple issues that were some of the

18    objections so I'd just like to raise it.  They indicated

19    that people outside of the class area were not included in

20    the settlement.

21         THE COURT:  That's always going to be true.

22    It's always going to be true.  I didn't interrupt them to

23    say that.  But wherever you draw a line, there's someone

24    on the other side of that line.  And that's just the way

25    it is.  And there's always going to be that situation.

1    And so, you know, I told you I think on many of these

2    concerns, I understand the folks' concerns.  If you lived

3    on the other side of the line, you would feel that way,

4    too.  But you've got to draw a line somewhere, and this is

5    where the line is drawn.

6            **MR. NAPOLI:**  And so just as part of the process,

7    we did have engineers that we regularly employ.  And I've

8    been doing groundwater cases for 25-plus years.  So we

9    certainly understand a number of issues.

10           And first, when it comes to the town working

11   together to develop the drinking water, primary

12   jurisdiction lies with the DNR.  And they're the ones who

13   issue the permits and allow this to happen, working

14   together with the town.

15           And then when it comes to the fish and the

16   wildlife, in those types of claims, those are natural

17   resource damage claims that are typically brought by the

18   state.  And here, in the state of Wisconsin, I'm aware

19   that the AG's office is currently looking to investigate

20   to potentially bring those claims.  But those would not be

21   claims --

22           **THE COURT:**  And I have, by the way, a number of

23   states are in my case.  And I don't know about water

24   districts.  Do we have any Wisconsin water districts in

25   ours?

1          MR. NAPOLI:  We do, Your Honor, I believe.  But

2     they certainly could bring a case and participate.  This

3     is a situation not where the company is saying we will not

4     pay.  They're saying we have put aside $140 million to

5     deal with the problem.  Please tell us what to do with the

6     money.  And it's really an issue unique to Wisconsin

7     because I did dig very deep into this to understand it.

8     And Your Honor, you have the city of Marinette to the

9     north and the Town of Peshtigo to the south.  And it's the

10    Town of Peshtigo that has the private wells that are

11    contaminated, while the city is the most probable best

12    option for providing the drinking water.  Well, unique to

13    Wisconsin, once you bring drinking water, and we're

14    talking about appropriation states because we're in the

15    west, whenever you provide water in an appropriation in

16    Wisconsin to a town, you annex them as part of your tax --

17          THE COURT:  Let me give you a little secret.  In

18    South Carolina we do not have that rule.  I represented

19    the City of Columbia.  We conditioned if you got water

20    system, you got annexed.  So it might not have been

21    mandatory, but that's the way it works.

22          MR. NAPOLI:  And there's a situation going on

23    which it is not something -- we tried to deal with it

24    because there's no greater advocate than us on the

25    plaintiff's side to try to substantiate and move that

1    forward.  And, you know, they have their own political

2    issues.

3            **THE COURT:**  They have legit -- I understand.

4    I've been in those debates representing the City of

5    Columbia.  I've heard those debates and I know them.  And

6    that's beyond, again, the scope of this settlement.  We

7    just can't get to that.

8            Regardless of what the past -- Tyco did in the

9    past, you've got to say, their behavior going forward has

10    been commendable.  And they're trying to do it.  There's

11    no perfect way to do this.

12            And that's why I think we -- you know, what we

13    want to do is endeavor to find a path here that's fair to

14    the local folks and provides them some opportunity for

15    reasonable relief without having to sacrifice rights they

16    may have that shouldn't be part of the settlement.

17            Let me go if I could to Charles and Cindy Boyle.

18    Are the Boyles on line?

19            **MR. BOYLE:**  Yes, Your Honor, we are.

20            **THE COURT:**  Very good.  And I'd be glad to hear

21    -- is that you, Mr. Boyle?  Is that Charles Boyle?

22            **MR. BOYLE:**  I am.  You may call me Chuck,

23    please.

24            **THE COURT:**  Thank you.  Well, Chuck, I'd be glad

25    to hear from you on your concerns.

1      **MR. BOYLE:** Okay. First of all, Your Honor, we

2  were originally represented by Mr. Bilott. And he would

3  not agree to do our objections, so then we reached out to

4  an attorney, Chris Nidel, who was denied admission to the

5  MDL by Senior MDL Law Clerk Blaise Barber I believe.

6          So I guess my objection speaks for itself. I'd

7  just like to make a few comments after listening to the

8  defense attorney and to Attorney Napoli. First of all,

9  when Mr. Baur testified regarding the onsite

10  contamination, I believe it's that 400 parts per trillion

11  in one hot spot -- 400,000 parts per trillion. And I

12  think Attorney Petrosinelli even said that this plume is

13  moving southeast, which I agree with him on that.

14          The fix that deals with the extraction wells, I

15  believe that extraction wells that the specific line to be

16  northeast of these sites. They've tried to regulate

17  (audio interference) contamination that's going into the

18  Bay of Green Bay that ultimately would be considered a

19  Clean Water Act violation.

20          The DNR in the area, which the Defendant Tyco,

21  Johnson Controls not just (audio interference) ability for

22  would reach the amount of contamination that exceeds 20

23  parts per trillion and 70 parts per trillion. (Audio

24  interference). So that's being investigated with (audio

25  interference). We had took a (audio interference) of our

1    downspout that were filled with.

2              THE CLERK:  Mr. Boyle?

3              MR. BOYLE:  Yes, ma'am?

4              THE CLERK:  Would you slow down and speak more

5    clearly.  We're having a hard time hearing you.

6              THE COURT:  Please continue, sir.

7              MR. BOYLE:  Can you hear me?

8              THE COURT:  Yes.  We're having trouble -- just

9    the transmission was weak.

10             MR. BOYLE:  Okay.  Can you hear me better now?

11             THE COURT:  Yes, sir.

12             MR. BOYLE:  Okay.  I also have (audio

13   interference) Attorney Petrosinelli said they were no

14   longer doing any AFFF testing.  That is not correct.  I

15   have a correspondence memorandum from the State of

16   Wisconsin dated (audio interference) where the employees

17   from the -- (audio interference)

18             THE COURT REPORTER:  He's breaking up.  I'm not

19   getting it.

20             THE COURT:  Sir, we're continuing to have -- are

21   you on a speakerphone?

22             MR. BOYLE:  I am, sir.

23             THE COURT:  Yeah.  I think you need to -- we're

24   just really having trouble hearing you.  It's just coming

25   off as sort of a muddle.  Could you just pick up a regular

1     phone?  I think it might be better.

2              **MR. BOYLE:**  I am -- how does this sound?

3     Better?

4              **THE COURT:**  Yes.

5              **MR. BOYLE:**  Okay.  Sorry about that.  So I have

6     a correspondence memorandum from the State of Wisconsin

7     that is from Randy Maddy (phonetic) (audio interference)

8     who confirms that the (audio interference) product is

9     (audio interference) AFFF.

10             **THE COURT:**  Sir, my court reporter is having

11    trouble hearing you and you're breaking up.  I'm just

12    trying to get a grapple of what the issue is.  Are you on

13    a cell phone?

14             **MR. BOYLE:**  I am, Your Honor.  I don't have a

15    land line at this location.

16             **THE COURT:**  Yeah, join the crowd.

17             **MR. BOYLE:**  Can you hear me better now?

18             **THE COURT:**  If -- it's a combination of things.

19    Number one, you're speaking awfully fast.  And secondly,

20    it's breaking up on us.  So we're only hearing like two

21    out of every three words.

22             **MR. BOYLE:**  Okay.  I will slow down.

23             **THE COURT:**  I want to hear what you've got to

24    say so, you know, it's important that we -- and I have --

25    by the way, Mr. Boyle, I have read Mr. Nidel's filings,

1    objections on your behalf.  I have read that with a

2    considerable amount of care.

3         MR. BOYLE:  Thank you.  So I think the comment I

4    was trying to make responding to Mr. Petrosinelli stating

5    that they no longer test AFFF, they still test AFFF

6    indoors without any covers or anything like that (audio

7    interference) contamination from the air emissions.

8         I would really ask that if you decide to go

9    forward on this that you give us more time, 90 days or so.

10   And Attorney Napoli mentioned between Michael London, this

11   is the first I've heard that Michael London is working on

12   this with him.

13        I think you heard me when I said that Attorney

14   Bilott would not help with objections.  Are you still able

15   to hear me, Your Honor?

16        THE COURT:  I'm hearing you, yes.  You know, it

17   would be more helpful, if you've got specific objections

18   to the settlement, rather than to the attorneys, that

19   might be helpful.

20        MR. BOYLE:  I can wrap up, Your Honor.

21        THE COURT:  Thank you.

22        MR. BOYLE:  I would hope that we could move

23   forward and do a bellwether test file on this and see what

24   it would yield.  My wife -- (audio interference)

25        THE COURT REPORTER:  I think he said his wife

1   wants to speak.

2          THE COURT:  His wife wants to speak?  Okay.

3          MR. BOYLE:  Yes.  (Audio interference)  I'm

4   going to mute mine, Your Honor.

5          MS. BOYLE:  Your Honor, this is Cindy Boyle.

6   Can you hear me?

7          THE COURT:  Yes, ma'am, I can hear you just

8   fine.

9          MS. BOYLE:  All right.  One moment please.  I'm

10  going to ask my husband to actually hang up.  It will help

11  my connection further.  All right.  Can you hear me all

12  right?

13         THE COURT:  Yes, ma'am.

14         MS. BOYLE:  Okay.  First of all, thank you, Your

15  Honor, for taking (audio interference) on behalf of the

16  class who are most impacted.  Thank you very much.  We

17  have spent considerable time in (audio interference) to my

18  objections which led with the need to decouple the

19  personal injury and property damage component.  Your

20  reference to the lack of choice says it all.  And that's

21  exactly what so many class members have been struggling

22  with.  I understand that the defendant would like very

23  much to keep those things joined.  But the public has

24  shown that to be their greatest hurdle.  It's just too big

25  of a gamble.  And I think you understand that perfectly

1    well.

2            THE COURT:  Ms. Boyle, let me ask you this

3    question.  If those issues were separated, and you could

4    file -- you and your husband could file a property claim

5    and exposure claim without affecting your right to later

6    pursue a latent injury claim, would you file a damage

7    claim?

8            MS. BOYLE:  Yes.

9            THE COURT:  Okay.

10           MS. BOYLE:  I think that it's helps our decision

11   making immensely.  We have -- I put you on speaker so I

12   hope you can still hear me well?

13           THE COURT:  Yes.

14           MS. BOYLE:  Thank you.  We have a unique story.

15   And I'll be honest, I would say that it increases our

16   likelihood significantly, yes.  We happen to have a

17   property that just last summer we had our realtor come out

18   and give us an assessment of its value and it was at

19   $2 million.  We have a very unique waterfront property

20   with a considerable amount of waterfront, three plots

21   which are undeveloped.

22           My further concern regarding the demunition of

23   property value is that it does not include properties that

24   do not have wells.  And so, in other words, you have

25   undeveloped properties.  And if we are to believe the EPA

1    and Attorney Napoli who have all stated that they

2    anticipate PFOA and PFOS will likely be considered (audio

3    interference) in the summer of 2022.  Any potential

4    development on our properties would be at our expense of

5    removal of (audio interference)

6              **THE COURT REPORTER:**  I can't hear her.

7              **THE COURT:**  Just keep going.

8              **MS. BOYLE:**  -- which we know the ground is

9    filled with (audio interference).  And the settlement

10   (audio interference) I don't have on the town.  That also

11   would apply a significant amount of property if a rural

12   community that's not unusual using it for farmland or

13   large (audio interference) and 20, 40 or more acres around

14   here.  So I think an argument can be made that I'm having

15   considerations for properties that don't have wells is

16   something that I would very much like that to be

17   re-evaluated, if at all possible.  But that being said, I

18   think that we would be much more inclined to consider it.

19   We would not consider it if it is not decoupled.  It's

20   absolutely too far great a gamble.  Knowing (audio

21   interference) our properties combined over 60 parts per

22   trillion, (audio interference) me and my husband have

23   (audio interference), et cetera.

24              **THE COURT:**  Okay.

25              **MS. BOYLE:**  May I continue with respect to the

1    water line exception?

2         THE COURT REPORTER:  She said may I continue

3    with respect to the water line exception?

4         THE COURT:  Yes.  You're breaking up.  You're

5    starting to break up on me.  My court reporter is

6    struggling to get the full impact.  So if you could

7    speak -- make sure you're speaking loudly and into your

8    telephone, that would be helpful.

9         MS. BOYLE:  I will.  Thank you.  And I will

10   speak slower.

11        One final remark regarding the decoupling of

12   personal injury and property damage, you know, I would

13   agree with Chuck that we really need far more time than

14   seven days to make that determination.  I would like for

15   you to consider (audio interference) so that we could

16   determine whether or not we could even get representation.

17   I just think seven days is --

18        THE COURT:  Ms. Boyle, how many days would you

19   think would be reasonable?

20        MS. BOYLE:  Ninety.

21        THE COURT:  Ninety?

22        MS. BOYLE:  Yes.

23        THE COURT:  Okay.  Anything further?

24        MS. BOYLE:  Yes.  Thank you.  The last thing I

25   want to really touch on is -- and you've been very

1    articulate.  And I understand the points you've made

2    regarding this settlement being separate from the

3    permanent water supply.  Because as I understand it, your

4    argument is that the demunition of property value payout

5    takes that into consideration.

6         The part I find difficult to understand is that

7    the class boundary has been identified.  And I'm sure

8    you're well aware of what that is.  But JCI, the

9    defendant, is publicly in writing only promising permanent

10   safe drinking water provided to less than half of the

11   boundary.  In order to fully restore property value and

12   have confidence in wells is something we need most is

13   permanent safe drinking water not at our (audio

14   interference).  And my fear is that the settlement (audio

15   interference) and JCI is released from all class members,

16   they will simply say our burden of responsibility has been

17   met by (audio interference) and you all are on your own

18   now for getting permanent safe water.  (Audio

19   interference)

20        THE COURT:  Okay.  Well, thank you very much,

21   Ms. Boyle.

22        MS. BOYLE:  Thank you very much, Your Honor.

23        THE COURT:  Very good.

24        I'm now going to call on Ms. Kayla Furton.  Are

25   you on the line?

Karen E. Martin, RMR, CRR

US District Court

District of South Carolina

1          **MS. FURTON:** Yes. Can you hear me?

2          **THE COURT:** Yes, ma'am.

3          **MS. FURTON:** Great. I want to thank you so very

4    much for your time and attention to detail to this case

5    which is evidenced by your questions and comments (audio

6    interference).

7          I am a former resident of the settlement area of

8    the contamination. I am also a current resident and

9    homeowner in the settlement area of contamination. I am

10   also a parent of three young children living in the

11   settlement area from the contamination. So I have a few

12   points of objections that I'd like to highlight in the

13   letter that I sent the Court.

14         One is a clarification. Prior to February of

15   this year, our home was one of the 81 percent that counsel

16   had referenced as being under. However, in February of

17   this year our well amount was over 60 parts per trillion

18   combined. With that information -- and also we are about

19   three and a half or four miles from the Fire Technology

20   Center, certainly not within that half mile radius that

21   was referenced earlier. I could not get concrete

22   information regarding which results would be utilized to

23   determine our settlement amount. However, I did receive

24   multiple communications regarding how to withdraw my

25   objections. And I do not believe it is fair for

1   individuals who are not lawyers or engineers to not have

2   proper counsel in making decisions (audio interference).

3   I've read the settlement multiple times.  I am a teacher.

4   I'm not a lawyer.

5           Another point I'd like to address is about the

6   PFAS system which Tyco JCI is putting forward with the

7   (audio interference) and addresses contamination heading

8   towards Michigan.  But it does not address contamination

9   in the ground (audio interference).  And I bring that up

10  as a point that was raised today.

11          Another objection that I would like to bring

12  after some of what Cindy Boyle shared, I am on the Town of

13  Peshtigo Board.  I am well aware that the water (audio

14  interference) long-term safe water action is outside of

15  this settlement.  However, I'm left with (audio

16  interference) which frequently changed which I feel like

17  is not fair to residents.  And it also is not (audio

18  interference) a settlement (audio interference).  It

19  included this quote.  It is very important to know that

20  all class members will be releasing their rights to

21  defendants who obtain an alternative water source even if

22  the class member does not make a claim under the

23  settlement.  So while counsel continues to state that it

24  is completely separate, I do understand residents' desire

25  to maintain a legal option to obtain long-term drinking

1    water especially considering that Tyco has not commented

2    and is not providing water to over half of the settlement

3    here.

4          I do want to (audio interference).  I absolutely

5    echo your concerns about property and personal injury

6    links.  I do believe that they should be separated.  A

7    major concern I have for the personal injury, which

8    according to my understanding I would well support, is the

9    need to completely release my entire medical history

10   rather than just that pertaining to the claim.  And there

11   is no mention of who would have access to that information

12   along with my social security number.  So I do not feel it

13   is fair for me to release all of my information without

14   any reassurance of security of that information.

15         THE COURT:  Very good.  Okay.  Anything further,

16   Ms. Furton?

17         MS. FURTON:  Um, I could go on all day.  So I

18   very much appreciate your time.

19         THE COURT:  Okay.

20         MS. FURTON:  I would also like to request an

21   extension time period for individuals to make a decision

22   after your ruling.  It does take a significant amount of

23   time to try to process, gather, and obtain any necessary

24   additional information to make the decision that would be

25   best for our family.  So an extension of time is greatly

1   needed.

2           **THE COURT:**  Thank you very much.

3           I'm now going to turn to -- is Mr. Brett

4   Kowalski on the line?

5       (There was no response.)

6           **THE COURT:**  Okay.  Then I had an indication that

7   Ms. Pamela Goes and Ms. Patricia Kotecki wish to speak.

8           **MS. GOES:**  I am Pam.  Hi.  Can you hear me?

9           **THE COURT:**  Yes.  If you could speak up just a

10  little bit, please, ma'am.

11          **MS. GOES:**  Yes, I am Pamela Goes.

12          **THE COURT:**  Yes, ma'am.

13          **MS. GOES:**  My mom is Patricia Kotecki.  She is

14  unable to be with us today.  My parents own property in

15  the plume area that is (audio interference).  So I speak

16  for myself, grew up there, as well for my parents who are

17  still in the upstate and (audio interference) objections

18  with them.  Thank you, Judge, for hearing our concerns.

19  I'm just going to speak from the heart.

20          At this point that separation for personal

21  injury claims needs to be separate.  You cannot (audio

22  interference) by coupling it together.  I think as a

23  cancer survivor I think that no amount of money could

24  restore my health.  But for those coming behind me, for

25  the young children that are being raised in these homes,

1    this needs to be separated out.

2              It is vital that clean water be given to these

3    people at no cost.  I understand your position in regards

4    to the information you gave us (audio interference) in

5    clean water.  However, when you're talking about property

6    damage, without clean water being incorporated in there,

7    it's really no choice.  You can't (audio interference).

8    Who wants that property that you can't drink water on?

9    It's that simple.

10             I understand that (audio interference).  Tyco

11   may, Tyco should.  It doesn't say Tyco will provide clean

12   drinking water.  It says (audio interference) Tyco would

13   provide bottled water.  It doesn't say Tyco will service

14   point systems that are in people's homes.  That's the

15   number one concern along with the personal injury.

16             I would also ask the Court to please grant a

17   minimum of 90 days.  This took years for this damage to

18   occur.  It also took years for us to get a handle on it of

19   what it actually means.  I don't think any of the

20   timelines that (audio interference) to diagnose this to

21   take into account (audio interference) the comments that

22   you made in regard to the amount of time the (audio

23   interference) of the lawyers involved.

24             I speak from the heart.  I ask you to please

25   (audio interference) with all of that.

1          **THE COURT:**  Thank you very much.

2          Okay.  Well, those are the individuals who have

3    given us notice of wanting to be heard.

4          Mr. Napoli, anything you wish to add?

5          **MR. NAPOLI:**  Your Honor, I would.  I think it's

6    important for the Court to hear the breadth of the notice.

7    It would take a couple of minutes.  The notice

8    administrator is on, Mr. Garretson, and Kristen Davis.

9    I've heard the statistics and I think the reason -- one of

10   the reasons why we've had a fulsome day today with

11   objectors is because of the breadth of the notice.  If you

12   would indulge Mr. Garretson --

13         **THE COURT:**  When you're saying the breadth of

14   the notice, what are you telling me?  I mean, I've read

15   the notice.  And I've read what y'all have done.  What

16   else do you wish to add?

17         **MR. NAPOLI:**  I would just like to have

18   Mr. Garretson tell you how many people it's reached --

19         **THE COURT:**  Sure.  Sure.

20         **MR. NAPOLI:**  -- if we could.  And I know him and

21   Kristen Davis are on the line.

22         **THE COURT:**  Let me just say this to folks who

23   are listening.  This proposed class is not a group you

24   could readily just say I can go to a ready source and have

25   addresses.  Some people formally resided in the community.

1    Some were non-owners.  Some were residents.  Some were

2    leasers.  So the idea that we're simply going to mail to a

3    class is not realistic.

4           And I know that the parties, in an effort to

5    provide notice, elected to use not just mailing but social

6    media and community meetings and other methods, ads in the

7    local newspaper, et cetera.  And there's going to be no

8    perfect way to do this.  There just isn't because of a

9    variety of people who are covered by the class and the

10   lack of an easy list to simply drop a mailing to.  If they

11   had that, I know that it wouldn't be as challenging as it

12   is now.  So I wanted to lay that background that this

13   was -- there was always going to be an imperfect method

14   simply because of the nature of the class.

15          Now, Mr. Napoli, you can go from there.

16          **MR. NAPOLI:**  Okay.  Mr. Garretson and Ms. Davis

17   are on the Zoom, Your Honor.

18          **THE COURT:**  Yes.

19          **MR. NAPOLI:**  Mr. Garretson, if you could

20   comment?

21          **MR. GARRETSON:**  Sure.  Thank you, Your Honor.

22   It's Matt Garretson.  I'm the cofounder of Signal

23   Interactive Media which is the court-appointed class

24   notice agent.  And with me today is my colleague, Kristen

25   Davis.  And I asked her to speak to the Court here today

```
 1    with me because one of the unique things that this
 2    settlement's had, compared to other settlements in which
 3    we've recently done notices, the high level of engagement
 4    with social media and with the digital component.  And
 5    because the Court allowed us to use the digital
 6    components, I thought it would be good to report to the
 7    Court on the success of that.
 8              THE COURT:  Mr. Garretson, am I correct that
 9    when you have a class that's not -- that sort of covers an
10    extended period of time and people residing in an area,
11    not just owners, that that's a particular challenge for
12    you as someone responsible for getting notice out?
13              MR. GARRETSON:  Yes.  And so the idea then
14    becomes how do we get people to share the message and
15    communicate to former neighbors and loved ones and family
16    members that may be former owners and to go back in time
17    so broadly as we've had to reach those people.
18              And so, Your Honor's correct.  We did do
19    individual direct notice to 600-plus households.  And we
20    did run 375 radio advertisements and a series of print
21    advertisements.  But often those are geographically
22    confined.
23              So the digital notice has really become the way
24    in which we get engagement with class members who are no
25    longer present in a class area or may not any longer be
```

1    present.  So I don't want to waste the Court's time

2    talking about things that the Court would know about the

3    direct notice.  So without further ado, what I'd like

4    Kristen to do is share with the Court the way in which we

5    saw real peaks in the digital notice and social notice

6    campaigns.

7              **THE COURT:**  That would be great.

8              **MS. DAVIS:**  Thank you, Matt.

9              Hello, everyone.  My name is Kristen Davis and

10   I'm a key member of the team at Signal.  And I executed

11   the digital campaign that we're going to talk about

12   briefly now.  Simply because we didn't know exactly who

13   all the putative class members were, and where they might

14   be, and they cycle a large date-age range, we used a lot

15   of different types of platforms to try to reach people.

16             They included social media, which includes

17   Facebook and Instagram; Display, which essentially means

18   internal web scanner advertisements that you could see

19   anywhere that class members would be on the web, either

20   kind of along the side or above the top of web pages.

21             Then we also did search campaigns on Google

22   Search and Yahoo so that (audio interference) had to do

23   with the class action such as (audio interference)

24   settlements or fire fighting foam lawsuits would then have

25   a link directly to the settlement website.

1          So, essentially, we put out advertisements

2     linking directly to the settlement website on all these

3     platforms.  And to date, they've been seen 1.7 million

4     times.  And more interesting than the number of times

5     they've been seen is the number of unique individuals who

6     have actually seen them.  So we have reached over 60,000

7     unique individuals with these ads and over 175,000 unique

8     devices with some who saw the ads on their mobile phone

9     and saw the ads again on their home computer or perhaps on

10    their tablet.

11         Among these people, more than 7,000 connected to

12    the website.  Some connected to the website more than

13    once.  And then beyond that, more than 80 people filed

14    claims after directly seeing these ads online and then

15    going into the online claims (audio interference).

16         I think that beyond the success, what's really

17    interesting is the engagement that Matt mentioned.  And we

18    particularly saw this on Facebook and Instagram where more

19    than 200 people reacted to the ads directly.  So that

20    means they liked them, they expressed anger, or they

21    expressed surprise in response to seeing them.

22         We had people, approximately 200 people also

23    share the notice on their Facebook network.  And what this

24    means is that person sees our ad and then they click a

25    button to actually place the ad on their own timeline.

1    And this allows anyone who is friends with that person to

2    see that ad as well.

3           We have dozens and dozens of claimants write

4    comments on the ads.  These really ran the gamut.  The

5    comments were pretty (audio interference) especially

6    around the time of the community meetings where we saw

7    people were sharing information about the meeting and

8    discussing the (audio interference) in the settlement,

9    like water level testing.  We also saw people commenting

10   by tagging their friends on the ads which would

11   essentially provide notification to other people as the

12   notice was relevant to them.

13          And then, lastly, we had dozens and dozens of

14   people save the post on Facebook.  And this is significant

15   because when you're scrolling through Facebook and seeing

16   advertisements and such, they will disappear off your feed

17   as you continue to scroll and you won't be able to access

18   them when you reopen the application.  But saving the post

19   essentially puts it into a file on your personal Facebook

20   page that you can go back to at any time.

21          So I think the purpose of all of this is to say

22   that we're pleased to see that we reached the right

23   targets and that people were engaged with the message.

24   They were engaged with the settlement content.  And they

25   wanted to spread the content around with the people in

1    their communities.

2            THE COURT:  Well, thank you very much.  Welcome

3    to the new world, huh?  How you communicate with people,

4    particularly people who may not reside in the community

5    anymore but who have potential claims.  So thank you very

6    much for that explanation.

7            MR. NAPOLI:  And Your Honor, just to add to what

8    the notice claims administrator has indicated, we as

9    counsel also held a town hall meeting virtually.

10   Certainly, we would have done it in person had it not been

11   for COVID.  It was very well attended.  It was also

12   attended by --

13           THE COURT:  How many people attended,

14   Mr. Napoli?

15           MR. NAPOLI:  There were over 80, if I recall

16   correctly, 80.  And a large number of people aggregated in

17   an individual home.  So it was likely a lot more than that

18   because I've spoken to a number myself of class members

19   who said they were going to have like a tea or something

20   and have everybody listen and ask questions.  We answered

21   questions.

22           Mr. Garretson participated.  And the claims

23   administrator, Mr. Cohen, also participated.  We talked

24   about it.  One of the objectors talked about the class

25   website changing.  That was by design.  As we got

1    questions that we identified the people wanted answers to,

2    we came up with the answers.  We shared some of the

3    answers that dealt with the settlement agreement with the

4    defendants for their input to understand to make sure we

5    were on the same page understanding.  And so we did put a

6    lot of effort into notice in the class.

7        **THE COURT:**  Let me say this.  The people who

8    have spoken here today were very well informed.  They had

9    to learn that information from somewhere.  And they,

10   obviously, read the settlement agreement.  They listened

11   and participated in various programs and perhaps gathered

12   information on -- from social media sites.  Whatever.

13   These are not uninformed people.  And they have to make

14   their own intelligent choices about what they want to do.

15       I think y'all have done a very good job on

16   notice.  I just think -- when I first saw this, I said to

17   my staff, I said this is going to be really challenging

18   trying to communicate.  And, you know, I notice that they

19   had to get a young woman who grew up in all this to do the

20   social immediate.  You know, the old guys were saying,

21   well, let Ms. Davis do the talking.  I get that.  That's

22   what I would do.

23       And, you know, it's -- it is challenging because

24   a number of potential claimants probably don't even live

25   in Wisconsin anymore.  So how do you reach them?  How do

1    you find them?  These are fair questions.

2            But I've got to tell you, folks, I've now

3    listened to folks and read these objections.  A lot of

4    them circle back to this issue I raised right at the

5    beginning here.  I think people -- you know, the folks who

6    said I have a million-dollar property and may be damaged,

7    that's a kind of unique situation.  That's not typical for

8    this case.  And they may say I'm going to opt out and hire

9    a lawyer and litigate.  That's their business.  Okay?  But

10   that's not the typical claim here.  The typical claim is

11   the wells.  I mean, that's what our claims are about,

12   contaminated wells.

13           So, you know, we can't -- the settlement can't

14   do everything.  It can't cover areas not -- it cannot

15   cover claims outside the area.  It cannot cover potential

16   contamination that's not with the wells.  It is what it

17   is.  And it's got its strength and it's got its

18   weaknesses.

19           And the question I've got to ask is in the end

20   can we fashion a remedy here which is fair and reasonable

21   and reliable, and one in which our claims administrator

22   can actually administer?  That's what we've got to do

23   here.

24           **MR. NAPOLI:**  I wanted to address also one of the

25   other issues one of the objectors raised about security of

1    personal information.

2              THE COURT:  Yes.

3              MR. NAPOLI:  Because these days that's very

4    important.  And I want the Court know that we've hired,

5    along with the settlement administrator and the notice

6    administrator, we're hired a company, Epiq, that typically

7    handles processing these types of claims.  And I know from

8    my experience with them that they have all the badges and

9    certifications with HIPAA compliance and security

10   compliance.  And so we will update the website to let

11   class members know of their --

12             THE COURT:  Mr. Napoli, let me ask you about the

13   notice period.  What worries me is seven days may be too

14   short.  We don't need 90 days but maybe a little more

15   time.  I'm just worried about, if at some point I approve

16   the settlement, I want to make sure people have a chance

17   to get the information and respond to it.  And we just

18   need to think about, you know, what might make more sense

19   than seven days.  Seven is just a little tight.

20             MR. NAPOLI:  Sure.

21             THE COURT:  But again, you know, I don't know,

22   30 maybe might be enough -- might be enough time?  Maybe

23   that's too long.  I don't know.  I just want to raise this

24   with you.  I thought they had a point about the seven

25   days.  I'm just worried that by the time people learned of

1    it, they wouldn't have time to fairly evaluate it.

2          So I've got to say, people are very well

3    informed here.  But they need a little time to -- whatever

4    this Court finds -- if the Court approves the settlement,

5    it's not going to be exactly what we're doing right now,

6    it's going to be somewhat different.  And we're just going

7    to need to make sure that people understand it.

8          MR. NAPOLI:  Well, Your Honor, there's always a

9    balance with, you know, trying to get money -- because one

10   of the big other questions, how soon will we be paid?  And

11   so we are always concerned with that.

12         THE COURT:  We've got to balance those, there's

13   no question about it.

14         MR. NAPOLI:  Find a balance.  And I have heard

15   from a number of objectors that, you know, I didn't opt

16   out.  You know, this is a forum for them.  They've,

17   obviously, gone through a lot of trauma in their

18   community, which I certainly appreciate having, you know,

19   issues with their water, you know, in their homes.  So

20   that certainly concerns me a lot.

21         THE COURT:  But you may have fewer opt outs --

22   you may have people not wanting to opt out if we change it

23   because a lot of them had the concern about the coupling.

24   You may have more people buy in -- into the settlement

25   than you would otherwise.

1           In the end, you're never going to have a

2    situation where everybody's pleased.  Right?  It's just

3    not possible.  But what we're trying to do is get a

4    measure of fairness here.  And I think y'all have done a

5    great job and it's a good start.  I guess y'all wanted it

6    finished today.  It's not going to quite happen that way.

7    But I think we're on a good path here.  I think in the

8    end, you know, I feel like we can get there.  And then at

9    that point, once I feel comfortable that the parameters of

10   the settlement -- the parameters are fair and reasonable

11   and adequate, then people can make their own choices if

12   they believe that.  If they don't, they can opt out.

13          MR. NAPOLI:  Your Honor, may have we take a

14   break just for five minutes just to talk a little bit

15   about what we think is --

16          THE COURT:  Let me do this.  I want my two

17   leaders to come to my chambers if you would.  And I want

18   to chat with you a bit about how we might move forward

19   here.  So y'all want to confer a minute and in about five

20   minutes one of my court security people will bring you up.

21   How about that?

22          MR. NAPOLI:  That would be great.  And are we

23   going to keep the people on the phone and come back --

24          THE COURT:  No, we're going to adjourn this

25   hearing and I'm going to take the matter under advisement.

1          **MR. NAPOLI:**  Okay.

2          **MR. PETROSINELLI:**  That sounds good to me, Your

3    Honor.

4          **THE COURT:**  Very good.  Thank you very much.

5          So with that, this hearing is adjourned.

6       (WHEREUPON, court was adjourned at 12:01 p.m.)

7                              * * *

8    I certify that the foregoing is a correct transcript from

9    the record of proceedings in the above-entitled matter.

10     s/Karen E. Martin                    6/11/2021

11   _____        _____
     Karen E. Martin, RMR, CRR              Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25